**UNITED STATES of America, Plaintiff,**

v.

**Robert Lee WRIGHT, Jr., Defendant.**

**No. CR 76–2020.**

United States District Court,
N. D. Iowa, E. D.

Jan. 28, 1977.

Alan H. Kirshen, Asst. U.S. Atty., Sioux City, Iowa, for plaintiff.

Stanford J. Patterson, Waterloo, Iowa, for defendant.

McMANUS, Chief Judge.

This matter is before the court on defendant's motion to reconsider filed January 12, 1977, and resisted on January 14, 1977.

Defendant, Robert Lee Wright, Jr., moves the court to reconsider its order of January 10, 1977, denying his motion to suppress. The court, upon due consideration of testimony elicited at the hearing on the motion to suppress and at trial, here utilizes the opportunity to undertake reconsideration of its previous denial of the motion to suppress. The court reverses its previous position and now grants defendant's motion to suppress.

A procedural chronology is in order. Defendant Wright was charged in a five count indictment with unlawful possession of a sawed off shotgun. Pursuant to Wright's motion to suppress a hearing on the matter was held on January 7, 1977. Upon denial of the motion on January 12, 1977, defendant filed a motion to reconsider. Two days, later, on January 14, 1977, the matter was tried to a jury which returned a conviction on all five counts of the indictment.

The following generalized factual account is undisputed. On June 15, 1976, at approximately 10:00 p. m. Waterloo police officers, Heinz Hofmann and Robert Erbes were on routine patrol in their marked police car when they received a radio dispatch that a gas station at 302 West 11th Street in Waterloo had just been robbed by two adult black males possessing a long barreled hand gun with one of the males being taller than the other. An estimated six to eight minutes later the officers noticed two black males approximately eight blocks from the robbery scene. The two men appeared to notice the officers, then hesitate, and proceeded to enter a parked car nearby. The officers then noticed the car pull away from the curb, stop, back up to the curb, stop, pull forward again, before proceeding down the road. Upon stopping the car officer Hofmann noticed furtive movement by the occupants directed toward the center of the front seat.

Because of the armed robbery report and because of what the officers conceived to be suspicious behavior on the part of the two men officer Hofmann asked the driver (defendant) for identification. Defendant immediately got out of the car and appeared to be attempting to block officer Hofmann's view of the car's interior. However, officer Hofmann was able to peer into the front seat where he saw the handle of a modified Steven's .20 gauge shotgun protruding from the armrest. The officer immediately felt he was viewing the butt of an unlawful weapon and reached into the car and seized it.

Initially, the limitations of the court's decision must be set out. Defendant has contended that there were no reasonable grounds for stopping him much less probable cause for seizure of the weapon. The court rejects the contention that once defendant was stopped the officers had no probable cause to seize the weapon in plain view. It is the propriety of the investigatory stop that is questionable, however, and merits the court's attention.

It has been clear since *Terry v. Ohio,*[1] that whenever a police officer accosts an individual and restrains his freedom, he has seized that person within the meaning of the Fourth Amendment. Certainly, less than a rigorous standard of probable cause is necessary to justify the initial intrusion. But the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant the intrusion. *Terry* at 21, 88 S.Ct. 1868. The reasonableness of the stop must be viewed in light of the facts known to the officer at the time of the stop. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

By virtue of the testimony at the suppression hearing, and the testimony at trial, the court has now been able to piece together what the "articulable facts" leading to the case at bar were.

The description of the gas station thieves radioed to officers Hofmann and Erbes was unquestionably wanting in specificity. Adopting as true even the most detailed recollection of the suspect's description in the radio dispatch[2] the police officers were alerted to two Negro males, one 5'11" in height, the other taller, heading on foot in an easterly direction from the scene of the robbery toward the river. Upon receipt of this description officer Hofmann testified at trial that he and officer Erbes then headed from the west side of the river in the generalized direction of flight toward the east side, the "colored" side of town. Officer Hofmann further stated and reiterated that at this point they would stop any two adult male Negroes.[3]

The first two adult, male Negroes, indeed the only two, that the policemen encountered during the time in question were Terry Bell and the defendant, Robert Lee Wright, Jr. When first observed Bell and Wright were standing on the parking in the vicinity of 11th and Mulberry Streets in a predominantly black area of Waterloo. Both officers testified that they could not tell from their vantage point how tall either of the suspects were or even that one of the suspects was taller than the other. However, the suspects looked at the police car,[4] faced each other as if conferring, and then entered a nearby car. At this point both officers testified that they decided to stop the car. By the time the officers succeeded in cutting off escape for the purpose of initiating the investigatory stop defendant's car had already engaged in the alternate backward-forward traversal already alluded to.

It is clear from an examination of the "articulable facts" and the officers' testimony that the defendant and Terry Bell were stopped because they were black. All of the other bases for the stop fail when subjected to further consideration. At the distance from which the officers perceived the suspects, relative height was indeterminable.

---

1. 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. The government's key testimony of the substance of the radio communication, that of officer Hofmann, was alternately vague and precise, sometimes conflicting, and contradicted by officer Erbes. For example, officer Hofmann testified at the suppression hearing that the report indicated that one of the suspects was 5'11" with the other being a little taller. However, officer Hofmann admitted upon cross-examination that at the state court suppression hearing held on September 13, 1976, three months from the date of the robbery, he had stated that the report indicated that one of the suspects was 5'8", with the other being a little taller. At other times Hofmann testified that the report indicated merely that one of the suspects was taller than the other. By contrast, officer Erbes recalled only that the report transmitted "two Negro males" as the only description.

3. Officer Hofmann indicated that they would not stop two Negro children because they would not comport with the height characteristics of the report.

4. The environs of 11th and Mulberry Streets were well-lighted by recently-installed street lights at the time that the incident occurred. Both officers testified that they felt the suspects had seen them.

The fact that Wright and Bell were both black and within eight blocks of the scene of the robbery was certainly relevant but not sufficient.[5] This relevancy is undercut, moreover, by the racial character of the neighborhood in which Wright and Bell were stopped. *See United States v. Nicholas,* 448 F.2d 622, 624–25 (8th Cir. 1971). The government does not argue that the officers could stop any two adult, male blacks within the area in which Wright and Bell were stopped. Yet as the officers testified, this is what they set out to do.

The court can give little weight to purported suspicious nature of the conferral of Bell and Wright subsequent to their apparent recognition of the officers' patrol car. This brief activity as articulated to the court was facially innocuous, seeming to serve more as a post hoc rationalization for the officers' intended stop of two black males than as genuinely suspicious activity.

Furthermore, the court does not consider the alternate forward-backward driving activity to supply reasonable grounds for the stop. First, both officers testified that they had made up their minds to stop Bell and Wright at the time of the observation of the purportedly suspicious conversation occurring on the parking near 11th and Mulberry. It was only during the process of maneuvering to make the intended stop after the officers had made up their minds, that they observed the alleged suspicious forward-backward activity.

Second, as already indicated, both officers felt that the suspects had seen them. This testimony was elicited in the context of proving up reasonable grounds for stopping Wright and Bell when the officers observed them to hesitate and then confer before entering the car. The very fact that the officers felt they had been observed undercuts the reasonableness of their suspicion regarding defendant's driving activity. It does not seem likely that in this context, defendant, upon observing a police car, would drive alternately backward and forward seemingly for the purpose of attracting attention. Moreover, such driving activity might very well have gone unnoticed in the absence of a previously expressed generalized intent to stop two adult, black males, and more specifically, to stop these two, the first adult black males encountered.

Recent pronouncements concerning the propriety of investigatory stops are not contrary to the result reached here. In *United States v. Collins,* 532 F.2d 79 (8th Cir. 1976) the court upheld the stop of one black male in a white over gold or brown 1969 Cadillac three miles from the scene of a bank robbery pursuant to a report that the three black male participants had fled in a light brown late model Cadillac. Conceding that the stop was a close case, the court emphasized the existence of information regarding the getaway car, and the fact that there was no showing that the arrest of the black defendant was in a predominantly black area. *Collins,* supra, at 82. In addition, there is no indication in *Collins* that the police were prepared to stop any three black males encountered in the area. These facts set *Collins* apart from the case at bar.

In *United States v. Powless,* 546 F.2d 792 (8th Cir. 1977), the court found no error in denying a motion to suppress a firearm where the initial stop was pursuant to a radio dispatch identifying by name one of the suspects for whom there was an outstanding state warrant, identifying the conveying vehicle as "a bronze or copper-colored van without license plates", and identifying the locus of flight as southbound from Rapid City, South Dakota, on Highway 16, and later, Highway 79 where the vehicle was ultimately stopped. These particularizing details were absent here.

---

5. The Supreme Court in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), refused to uphold an investigatory stop on the basis of apparent Mexican ancestry, even in the context of a border area stop, stating:

"The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *Id* at 886–87, 95 S.Ct. at 2583.

The court does not consider contrary the investigatory stop upheld in *United States v. Magda,* 547 F.2d 756 (2d Cir. 1976). There, the court upheld the investigatory stop of a man in a "narcotics prone location" by an officer experienced in narcotics arrests after his observing, from a distance of 35 feet, defendant and another man simultaneously exchanging something, the other man then looking at the officer and immediately parting defendant's company.

Assuming, for the sake of comparison, that the fact that the exchange took place in a "narcotics prone area" is functionally equivalent to the "investigation of a particular crime"[6] present here, a number of additional factors are distinguishable. First, the observation of the suspicious activity in *Magda* was made from a vantage point 35 feet away. In the case at bar observation of defendant and his companion was made at such a distance as to obscure discrete movements, or identifying characteristics such as height. Second, the activity observed in *Magda,* the simultaneous exchange of objects, bore a readily cognizable connection to the suspected crime of sale of narcotics. Here, purported suspicious activity of hesitation and conferral after observing the police car bore a slight connection, if any, to the suspected crime of the gas station robbery. As indicated earlier, the exchange between defendant and his companion, Terry Bell, was entirely innocent and susceptible of perfectly innocent interpretations. See *United States v. Magda,* supra at 759 (Motley, J., dissenting).

In summary, the court is of the opinion that an objective view of the articulable facts and an evaluation of the collective knowledge of officers Hofmann and Erbes[7] point to only one conclusion: that the only reason Robert Lee Wright, Jr. and his companion were stopped, and subsequently searched, was because they were two black males in an eight block radius vector extending east from the point of the gas station robbery.

Axiomatically the propriety of the investigatory stop here must stand or fall, in the face of a dearth of descriptive or corroborating information, on the propriety of conducting similar stops of any two black males in the area. In the opinion of the court the investigatory stop falls, and consequently, so does the fruit of the resulting search.

It is therefore

ORDERED

1. Motion to reconsider granted.

2. Defendant's motion for judgment of acquittal made at the close of all the evidence granted.

---

6. The determination of whether officers were investigating a particular crime has consistently been identified as one subject of proper inquiry in determining whether the consequent investigatory search was proper. *See United States v. Collins,* supra at 82; *United States v. Nicholas,* supra at 624.

7. *See Brewer v. Wolff,* 529 F.2d 787, 790 (8th Cir. 1976).