369 F.Supp. 26 (1974)
UNITED STATES of America, Plaintiff,
v.
Gregory CARTER, Defendant.
No. 73 CR 283 (4).
United States District Court, E. D. Missouri, E. D.
January 18, 1974.
*27 J. Patrick Glynn, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.
Jerome Kalishman, Clayton, Mo., for defendant.

MEMORANDUM AND ORDER
NANGLE, District Judge.
On October 31, 1973, the grand jury charged the defendant Gregory Carter with knowing possession of a Panasonic stereo cartridge tape deck stolen from an interstate freight shipment, in violation of 18 U.S.C. § 659. The defendant filed a joint motion for discovery and to suppress evidence. On December 28, 1973, the discovery portion of the motion was denied as moot. On that day the parties presented evidence on the suppression portion of the motion. The Court being fully advised in the premises of the motion makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
1. On October 25, 1973, between 2:00 a. m. and 2:30 a. m., Saint Louis (Missouri) Police Officer Richard Deavens was on patrol in a marked police car at the intersection of Page Boulevard and Newstead Boulevard in the City of St. Louis, Missouri. Officer Deavens was in uniform and armed. His police car was stationed on Newstead Boulevard, heading North, in the South East-West crosswalk at the Page Boulevard intersection. The area was dark and there were only two other automobiles in sight.
2. From this position in the intersection, at this time, Officer Deavens observed a 1968 Dodge Polara automobile, beige in color, enter the intersection on Page Boulevard proceeding West. The Polara was moving at from 30-35 m. p. h.; Officer Deavens did not consider it to be speeding.
3. Officer Deavens watched the Polara drive through the intersection and noticed the two occupants react to his presence. They appeared to him to be nervous. The passenger turned in his seat as the Polara passed Officer Deavens' police car so to be able to constantly observe the police car. Officer Deavens also observed that the driver kept his eyes on him through the rear view mirror. Officer Deavens surmised from their facial expressions that the occupants were both surprised and disturbed at his presence. He described their expressions as indicating that they "wished he was not there". For this reason he proceeded to follow them West on Page Boulevard.
4. Officer Deavens immediately came up behind the Polara and signalled with his red lights for it to stop. The Polara *28 complied and stopped within the first block West of Newstead Boulevard, near the intersection of Page Boulevard and Taylor Avenue.
5. After the Polara stopped, Officer Deavens left the police car and the driver of the Polara, the defendant in this action, stepped from the Polara without being asked. The defendant asked Officer Deavens if he had done anything wrong. Officer Deavens responded negatively and requested to see the defendant's driver's license. This was shown. Defendant stated that he had just come from the Greyhound bus terminal after purchasing cigarettes for the other occupant of the Polara. The passenger stepped from the Polara and was asked for identification which he could not produce. Officer Deavens did not search the defendant's or the passenger's persons for weapons.
6. Then, Officer Deavens looked through the Polara's windows and for the first time observed without a flashlight two cardboard packages [presumably in the back seat]. He asked the defendant and the passenger about the packages. The passenger answered that they were stereo component parts sent from school. Defendant stated that the passenger had asked him to pick them up from the Greyhound terminal. The passenger then asked Officer Deavens if he desired to look at the packages. Officer Deavens answered affirmatively and, in examining the packages noticed that they carried two different addresses, one address in Illinois and the other in Virginia, and that the packages contained a tape player, a recorder, and a turntable. The passenger commented that the boxes were unrelated to the stereo equipment inside.
7. At this time Officer Deavens ordered them to follow him in the Polara to the police station. There Officer Deavens telephoned the Greyhound offices and learned that the defendant was an employee and that these two packages had been in a Greyhound shipment.
8. Officer Deavens then advised the two occupants of their rights and formally arrested them. Up to this time he did not consider them to be under arrest. He believed he was detaining them for investigatory purposes. He never used his police weapon nor did he handcuff them prior to this time.
9. At approximately 2:00 p. m. on October 25, 1973, Federal Bureau of Investigation Special Agent Michael E. Stapleton interviewed defendant in the St. Louis City Jail. At this time Agent Stapleton was investigating the crime charged in this action. Agent Stapleton advised the defendant of his constitutional rights. Defendant orally indicated that he understood and waived them. Immediately thereafter defendant gave Agent Stapleton an oral statement involving himself in the alleged crime. Defendant did not desire to give a written statement; no reason was given for this.
10. On November 1, 1973, while still in state custody, defendant was arrested on a federal warrant. On that day he executed a written waiver of his constitutional rights, gave an oral statement that was reduced to writing and that was signed by the defendant.
11. No threats or promises were made to defendant to induce him to give the statements or to execute the waiver forms. When he did so he appeared sober and alert.

CONCLUSIONS OF LAW
Defendant seeks to suppress as evidence the stereo tape deck seized from the Polara automobile he drove on October 25, 1973, and all statements made by him before he was brought before the United States Magistrate on November 1, 1973.
Officer Deavens acted without a warrant when he directed defendant to stop his automobile and the stereo tape deck equipment was ultimately seized from the defendant without a warrant. Under such facts, the burden of showing *29 that the use of the subject evidence would not violate the Fourth Amendment rests with the United States. United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951).
The cardinal issue before the Court is whether the initial stop by Officer Deavens of defendant in the Polara was an unreasonable intrusion into his expectation of privacy protected by the Fourth Amendment. For, if this issue is answered in the affirmative, then any probable cause supplied by the later inspection of the packages in the Polara on the street and the still later station house investigation will fail, Orricer v. Erickson, 471 F.2d 1204, 1208 (8th Cir. 1973) (Webster concurring); and defendant's subsequent admissions will be inadmissible as fruits of an unreasonable seizure. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Small, 297 F. Supp. 582 (D.Mass.1969).
The initial stop of the Polara by Officer Deavens was a "seizure" cognizable under the Fourth Amendment. Carpenter v. Sigler, 419 F.2d 169, 171 (8th Cir. 1969); United States v. Harflinger, 436 F.2d 928 (8th Cir. 1970). Since there was no probable cause to arrest the occupants of the Polara when the stop was made, the stop must be justified, if at all, as an investigatory stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In determining the reasonableness of the stop
it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen", for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails". And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? . . . And simple "`good faith, on the part of the arresting officer is not enough' . . .". (citations omitted) (emphasis ours)
392 U.S. at 20-22, 88 S.Ct. at 1879, 1880.
The Court has carefully examined the testimony of Officer Deavens to find the facts, known by him, prior to the stop, upon which he could and did base his action in stopping the Polara. Those facts are (1) that the Polara was being operated in the early hours of the morning, (2) with few other automobiles in sight, (3) at a speed not considered to be speeding, and (4) that the occupants appeared surprised and disturbed at the presence of the police officer. The Court is of the opinion that these facts alone are not sufficient justification for stopping the Polara's occupants for identification purposes.
The United States has cited Carpenter v. Sigler, supra; United States v. Nicholas, 448 F.2d 622 (8th Cir. 1971); United States v. Wickizer, 465 F.2d 1154 (8th Cir. 1972) ; and United States v. Owens, 472 F.2d 780 (8th Cir. 1973) in support of its position. The facts known to the police officers in Carpenter, Wickizer, and Owens are sufficiently different from those in this case to render those cases inapposite.
The facts relevant to the investigatory stop in Carpenter involved (1) a small town location where unidentified cars do not routinely travel in the early morning hours, (2) out of county license plates, (3) a series of burglaries in the town, (4) the slow movement of the subject car past closed business establishments, and (5) a rather erratic course that the car took through the streets of the town. Wickizer is closer to this case factually *30 than Carpenter but it nevertheless, involved the police officer's knowledge of several rapes in the park area he was patrolling. Owens involved (1) recognition of the defendant as a person known to have a police record, (2) Owens' continually watching the police officers from his car ahead of theirs, (3) Owens' stopping and alighting at a place known to be where there was traffic in narcotics, (4) the quickening pace when he recognized the police officers, and especially (5) Owens' removal from his pocket of envelopes which resembled government checks.
The Court considers Nicholas, supra, more as support for its conclusion than as contrary authority. Therein the Court of Appeals for the Eighth Circuit reversed the conviction, ruling that the police improperly stopped the defendant for questioning initially. In so ruling the Court was impressed with the following observations, the first six of which are generally applicable to the facts of this case:
(1) the police were not investigating any particular crime;
(2) the police had no information respecting the car or its occupants;
(3) there is no showing in the record that the police had been informed of suspicious activities in the vicinity of the pool hall at the time of Nicholas' arrest, aside from their general knowledge that the area was highly trafficked in narcotics;
(4) the police observed the car for a very short time, during which time Sims sat quietly until Nicholas came out of the pool hall and entered the car;
(5) the hour, 11:15 p. m., was a reasonable hour for individuals to be abroad on the streets on a June evening;
(6) Nicholas and Sims were black men in a predominantly black area;
(7) the fact that a car has out-of-state license plates does not, of itself, indicate criminal activity.
448 F.2d at 624-625.
In consequence,
It is hereby ordered that the instant motion of the defendant Gregory Carter to suppress be and is sustained and the subject tape deck equipment and the subject admissions of the defendant are hereby ordered suppressed as evidence.